# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3772
_____

3M Company, and Subsidiaries

*Appellant*

v.

Commissioner of Internal Revenue

*Appellee*

------------------------------

Silicon Valley Tax Directors Group; National Taxpayers Union Foundation;
Chamber of Commerce of the United States of America; National Foreign Trade
Council, Inc.; National Association of Manufacturers

*Amici on Behalf of Appellant(s)*

David A. Weisbach

*Amicus on Behalf of Appellee(s)*

_____

United States Tax Court

_____

Submitted: October 22, 2024
Filed: October 1, 2025

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Statutes trump regulations. Over three decades ago, another court decided that the IRS could not tax a domestic parent company on royalties it could not legally receive from a foreign subsidiary. *See Procter & Gamble Co. v. Comm'r*, 961 F.2d 1255, 1259 (6th Cir. 1992). The IRS then authorized by regulation what a statute had not. That strategy might have worked before, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005), but not now, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), so we reverse.

I.

3M Company has subsidiaries all over the world. Its taxes are complicated, but it files a single consolidated federal tax return each year. This case is about whether the one it filed for 2006 should have reported more royalty income from its Brazilian subsidiary, 3M do Brasil Ltda.

One of 3M's most important assets is its intellectual property. Its foreign subsidiaries generally pay to use it. At the time, Brazilian law capped the amount a subsidiary could pay in royalties to a non-Brazilian controlling company like 3M. Limited to what it could deduct, 3M do Brasil paid only $5.1 million for the intellectual property it used. 3M then reported that amount on its federal tax return for 2006.

Several years later, the IRS sent a Notice of Deficiency letting 3M know it owed considerably more. As relevant here, the agency reallocated nearly $23.7 million in extra royalty income to reflect what, in its view, 3M *should* have received from its Brazilian subsidiary. *See* 26 U.S.C. § 482 (giving the IRS authority to reallocate a controlled group's taxable income). Both sides agree that the amount reflects the compensation an unrelated entity would have paid to use 3M's intellectual property. *See* 26 C.F.R. § 1.482-1(h)(2). The dispute here focuses on

-2-

whether the IRS *can* reallocate unpaid royalties that Brazilian law prevented 3M do Brasil from paying.

3M challenged the IRS's determination that it could in the United States Tax Court. One of its arguments was statutory: the IRS could not tax what Brazilian law blocked 3M from receiving. *See* 26 U.S.C. § 482. The other was procedural: the IRS did not follow the Administrative Procedure Act when it adopted the blocked-income regulation, 26 C.F.R. § 1.482-1(h)(2), that purportedly authorized it to do so. *See* 5 U.S.C. § 553 (setting out the requirements).

The vote in the Tax Court could not have been closer. A seven-judge plurality rejected 3M's procedural argument and deferred to the blocked-income regulation as a reasonable interpretation of an ambiguous statute. *See Brand X*, 545 U.S. at 982. Reaching a majority required adding the votes of two concurring judges, who thought the statute *required* the IRS to make the reallocation, regardless of what the regulation said. If allowed to stand, the patchwork judgment would require 3M to pay taxes on nearly $23.7 million more in royalty income.

The eight dissenters would have come out the other way. Some thought the statute unambiguously prohibited the IRS from reallocating income that 3M could not legally receive. *See Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 403 (1972) (stating that "income" does *not* include what the taxpayer "did not receive and that he was prohibited from receiving"). Others believed that even if the statute was ambiguous, the blocked-income regulation was unenforceable because the IRS had failed to follow the Administrative Procedure Act when adopting it. Six judges agreed with both points.

The legal landscape has changed since the case's last stop. After the Tax Court decision, the Supreme Court decided *Loper Bright Enterprises v. Raimondo*, which frees courts to adopt the "best reading of the statute": the one "the court would have reached if no agency were involved." 603 U.S. at 400 (citation omitted); *see* 5 U.S.C. § 706 (directing that, in a case reviewing administrative action, the "court

shall decide all relevant questions of law"). Our task, post *Loper Bright*, is to "use every tool at [our] disposal to . . . resolve [any] ambiguity." 603 U.S. at 400; *see Meyer, Borgman & Johnson, Inc. v. Comm'r*, 100 F.4th 986, 988 (8th Cir. 2024) ("This court reviews de novo the Tax Court's legal conclusions.").

## II.

The text is our guide. *See Artola v. Garland*, 996 F.3d 840, 843 (8th Cir. 2021). The IRS has the authority to "distribute, apportion, or allocate" income among commonly controlled companies, subject to some limitations. 26 U.S.C. § 482. The relevant statutory language provides as follows:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

*Id.* The passage is dense, but the "best reading" of it rules out what the IRS did here. *Loper Bright*, 603 U.S. at 400.

## A.

The first sentence tells us what the IRS can do, which is "distribute, apportion, or allocate gross income, deductions, credits, or allowances" between "two or more . . . businesses" that are "owned or controlled . . . by the same interests." 26 U.S.C. § 482. It is, as the Supreme Court has pointed out, a way for the IRS to

-4-

combat tax gamesmanship and "prevent 'artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises.'" *First Sec. Bank*, 405 U.S. at 400 (quoting Boris Bittker & James Eustice, *Federal Income Taxation of Corporations and Shareholders* 15–21 (3d ed. 1971)).

In operation, it is not as complex as the text makes it sound. When a commonly controlled corporation files its consolidated tax return for the whole group, it reports how much each individual company made. The amounts can be arbitrary, because the parent company—here, 3M—usually has the flexibility to structure the transactions among individual subsidiaries or between the subsidiary and the parent to avoid certain unfavorable tax consequences. *See, e.g.*, *Nw. Nat'l Bank of Minneapolis v. United States*, 556 F.2d 889, 892 (8th Cir. 1977). When it does, it opens the door to distortion through the shifting of "income, deductions, credits, or allowances." 26 U.S.C. § 482.

The congressional answer to that problem was IRS reallocation, which is the shifting of individual line items to reflect each entity's true income. *See id.* When it exercises the reallocation power, the IRS typically uses the "arm's length" standard to approximate how "uncontrolled taxpayers" would have structured the transaction. 26 C.F.R. § 1.482-1(b)(1). The problem, of course, is that reallocation can also be arbitrary because it answers a hypothetical question: what would two unrelated and independent entities have done?

This case strikes at the intersection of the IRS's authority and the safeguards built into the statute. One limit is when the IRS can use it: only when "*necessary*" to (1) "prevent evasion of taxes" or (2) "clearly . . . reflect the [controlled entities'] income." 26 U.S.C. § 482 (emphasis added). Given that 3M is just following Brazilian law, the IRS does not suggest it is trying to evade taxes on its 2006 return. Rather, its position is that Brazilian law distorts 3M's income because an unrelated entity would have paid a little over five times as much for use of its intellectual property. These types of payments, after all, can take place, just not to a controlling foreign entity. The IRS would end the analysis there.

A second limitation, however, requires us to keep going. For income to qualify, "a taxpayer must have complete dominion over it," meaning it is money that "*could* have [been] received." *First Sec. Bank*, 405 U.S. at 403 (emphasis added). If the law says otherwise, as 3M claims here, then it lacks "'complete power' to shift income among its [companies]." *Id.* at 404–05; *see id.* ("It is only where [complete] power exists, and has been exercised in such a way that the 'true taxable income' of a subsidiary has been understated, that the [IRS] is authorized to reallocate under § 482."). At least some of the power remains with the Brazilian government, which has prohibited the transaction that the IRS asks us to envision.

In many ways, this case looks a lot like *First Security Bank*. There, multiple related entities structured a transaction to avoid a federal law prohibiting banks from receiving commissions from the sale of insurance products. *See id.* at 398, 402. The IRS, using its § 482 reallocation power, assessed additional taxes on the theory that two banks in the group had artificially shifted their income to a non-bank subsidiary. *See id.* at 400. It made no difference to the IRS that they could not legally receive the income. *See id.* at 401 (noting that the banks "could never have received a share of these premiums").

The Supreme Court took a different view. Starting from the foundational principle that a person cannot "have taxable income that he did not receive and that he was prohibited from receiving," it concluded that the group of companies could not have "shift[ed] or distort[ed]" their income by structuring the transactions to follow federal law. *Id.* at 400, 403–05. If the banks "could not have received" the insurance commissions, then the IRS could not reallocate them as income under § 482. *Id.* at 406 (quoting *L.E. Shunk Latex Prods., Inc. v. Comm'r*, 18 T.C. 940, 961 (1952)).

3M's position is no different. Swap the National Bank Act with Brazilian tax law, and insurance commissions with royalty payments, and the resemblance becomes uncanny. The banks could not receive the income the IRS tried to attribute

-6-

to them, and neither can 3M.  The Supreme Court concluded in *First Security Bank* that "the premium income received by [the non-bank subsidiary] could not be attributable to the Banks."  *Id.* at 407.  In our view, attributing almost $23.7 million in extra royalties to 3M is just as inconsistent with the reality that it could not receive them without placing its Brazilian subsidiary in legal jeopardy.  The point is that, from a plain-and-ordinary-meaning standpoint, shifting income to 3M here would *not* "clearly . . . reflect [its] income."[1]  26 U.S.C. § 482.

### B.

The IRS asks us to focus on a *different* part of the statute.  About a decade after *First Security Bank*, Congress amended it to add the second sentence.  Recall what it says: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  26 U.S.C. § 482; *see* Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562–63 (1986).  The multi-million-dollar question is, what does it do?

The IRS has a ready answer.  Whatever *First Security Bank* says about other types of income, the rules have changed when it comes to "intangible property."  26 U.S.C. § 482.  Post amendment, the amount "*shall be* commensurate with the income attributable to the intangible."  *Id.* (emphasis added).  In other words, any income "attributable" to intellectual property counts, including whatever 3M's Brazilian subsidiary earned from it.  Even if it cannot legally pay for what it used.

### 1.

If the statute had only the second sentence, the IRS might have a point.  "[R]easonable statutory interpretation," however, "must account for both the

---

[1]We are not the first court to reach this conclusion.  *See, e.g.*, *L.E. Shunk Latex Prods.*, 18 T.C. at 961; *Procter & Gamble*, 961 F.2d at 1259; *Texaco, Inc. v. Comm'r*, 98 F.3d 825, 830 (5th Cir. 1996).

specific context in which language is used and the broader context of the statute as a whole." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation omitted). A statutory provision, after all, may seem to have one meaning "in isolation," but another when viewed in the context of "the design and structure of the statute as a whole." *Id.* (citation omitted). The most logical place to look for context is in the sentence right before it.

In that one, the statute tells us what the IRS may "apportion" or "allocate": "gross income." 26 U.S.C. § 482. Those two words, as we already know from *First Security Bank*, refer to amounts over which the taxpayer has "dominion or control." 405 U.S. at 404. What the taxpayer "*could* have received," whether it did or not. *Id.* at 403 (emphasis added). The second sentence, upon which the IRS hangs its hat, refers—not once, but twice—to "*the* income." 26 U.S.C. § 482 (emphasis added). To accept the IRS's argument, we must conclude that "the income" in the second sentence means something different than "gross income" in the first.

The roadblock for the IRS is the "presumption that a given term . . . mean[s] the same thing throughout a statute." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) (citation omitted). The presumption is particularly strong when a word like "the" precedes a previously used noun. *See id.*; *see also Webster's Third New International Dictionary* 2368 (1986). One feature of the English language, which usually goes unnoticed in the background, is that the first mention of a noun is often introduced by an indefinite article like "a" or "an" for singular nouns ("a dollar") or no article at all for plural nouns ("dollars") and mass nouns ("money"). It is a way of introducing a new idea to a reader. Then using "the" in front of later mentions of the same noun signals to the reader that the word is familiar. Like the last two sentences ("a reader," then "the reader"), § 482 follows this same pattern. *Compare* 26 U.S.C. § 482 (giving the IRS authority to "[re]allocate gross income"), *with id.* (referencing "the income" later).

The first sentence introduces a mass noun, "gross income," that has no article in front of it. *Id.* Then the second sentence with the carveout for "intangible

property" refers twice to "the income." *Id.* The grammatical implication is unmistakable: the shorthand references to "the income" in the second sentence are a callback to "gross income," the only possible antecedent in the statute. Same word, same meaning, at least in the absence of some textual clue ruling it out. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word . . . is presumed to bear the same meaning throughout a text."); *cf. Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of . . . judicial interpretation[s] of a statute and to adopt that interpretation when it re-enacts a statute without change." (citation omitted)). Here, there are none.

From this grammar lesson comes the statute's true meaning. The best reading—if not the only one—is that the IRS *can* "allocate" income, but only when the taxpayer has "dominion or control" over it. *First Sec. Bank*, 405 U.S. at 404; *see* 26 U.S.C. § 482 (providing that "the Secretary *may*" reallocate income (emphasis added)). The second sentence then says *how* to do it when it involves "intangible property": it "shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482. The meaning of the word "income" does not change. The power of reallocation always depends on a taxpayer's "complete dominion" over the funds, regardless of the type of property involved. *First Sec. Bank*, 405 U.S. at 403.

Even if the second sentence does not redefine what income means for intangible property, as the IRS seems to suggest, it still does work. It provides a measurement method for the income produced by intangible property, which can be a difficult task given that it has no physical existence. According to the second sentence, the amount "shall be commensurate with the income attributable to the intangible." 26 U.S.C. § 482. "Commensurate," as used here, means "equal in measure or extent," "proportionate," or "corresponding in size, extent, amount, or degree." *Webster's Third New International Dictionary* 456 (1986). It is not particularly helpful guidance until you consider what it does.

Suppose that Brazil imposed no legal restrictions on royalties among commonly controlled companies. 3M would have "dominion or control," *First Sec. Bank*, 405 U.S. at 404, over the income its intellectual property produced for 3M do Brasil. With no barrier to royalty payments, the IRS *could* reallocate its income, even if it never actually paid any. If it chose to do so, the income attributed to 3M would have to "be commensurate"—that is, equal or proportionate—to "the income attributable to the intangible." 26 U.S.C. § 482. The second sentence answers the how-much question, in other words, not the what-gets-allocated question that the first already answers. For the IRS, it is of no help in reallocating royalties that Brazilian law blocks 3M's subsidiary from paying.

2.

At one point, the IRS hardly put up a fight about the scope of § 482. When the case started, it was all about the blocked-income regulation that it claimed was a reasonable interpretation of a silent statute. *See* 26 C.F.R. § 1.482-1(h)(2) (describing which "foreign legal restrictions . . . will be taken into account"). Silence may have been an interpretive longshot after *First Security Bank*, but it was the hook that allowed it to fish for deference. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984).

The shifting sands of administrative law brought a change in the IRS's position. Center stage in its argument before, the blocked-income regulation is in the background now. Perhaps for good reason. As one of the *amici* points out, the IRS's current position that § 482 *requires* reallocation under the second sentence is both inconsistent with its prior litigating position and the regulations it asks us to consider. *See* 26 C.F.R. § 1.482-1(b)(1) (discussing adjustments); *id.* § 1.482-1(h)(2). To state the obvious, a statute cannot both be "silent as to the precise" question and unambiguously answer it at the same time.

But perhaps the bigger problem is the mismatch between the blocked-income regulation and the argument the IRS presses today. According to the regulation, the

agency *could* "take into account the effect of a foreign legal restriction" if it "affected an uncontrolled taxpayer under comparable circumstances." 26 C.F.R. § 1.482-1(h)(2). Whether it did depended on several non-statutory criteria, like whether the "restriction[] [was] publicly promulgated," it "expressly prevented the payment or receipt" of the money, and the taxpayer had "exhausted all remedies prescribed by foreign law." *Id.* § 1.482-1(h)(2)(ii)(A)–(C). None singled out intangible property for a bright-line always-reallocate rule. *See id.* To the contrary, it allowed the IRS to pick and choose its "distribut[ion], apportion[ment], and allocat[ion]" battles. 26 U.S.C. § 482.

In its post-*Loper Bright* supplemental briefing, the IRS argues that § 482 does the same thing by "delegat[ing] discretionary authority to" make the proposed reallocation. *Loper Bright*, 603 U.S. at 395. Even assuming § 482 works in the way the IRS suggests, it is still our job to "fix[] the boundaries of [that] delegated authority" based on the statute's text, as we have done today. *Id.* And to the extent the IRS is asking us to defer to an "interpretation[] . . . based upon . . . [its] specialized experience," *id.* at 388 (second ellipsis in original) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)), we decline to do so when the agency recently invented it and the statute has another "be[tter] reading," *id.* at 400. *See id.* at 388 (noting that the decision to give it "weight" depends on several factors, including "consistency with earlier . . . pronouncements" of the agency (quoting *Skidmore*, 323 U.S. at 140)).

## III.

When it comes to reading the statute, the IRS apparently realizes its biggest problem is the dominion-and-control test from *First Security Bank*. Even as the legal landscape has changed, the one constant has been its position that this case is factually and legally distinguishable.

## A.

The factual distinction comes from the source of the restriction. In *First Security Bank*, federal law blocked two banks from receiving commissions from the sale of insurance products. *See* 405 U.S. at 402. Here, by contrast, *foreign law* blocks the royalty payments to 3M, at least at amounts above what its Brazilian subsidiary can legally deduct.

It is a distinction, but not one that matters. If dominion or control is the dividing line for income under § 482, and income attribution requires the taxpayer to be an entity that "could have received it," it is not clear why the source of the restriction makes a difference. *Id.* at 403. A foreign restriction, like the one in Brazil, can deprive an American company of control over potential income just as effectively as a federal one. *See id.*; *Procter & Gamble*, 961 F.2d at 1259 ("The Supreme Court focused on whether the controlling interests utilized their control to distort income. We see no reason to alter this analysis because foreign law, as opposed to federal law, prevented payment of royalties.").

## B.

The IRS has also spotted a legal distinction, but it makes no difference either. In adopting the dominion-or-control test, the Supreme Court discussed a now-repealed regulation reflecting the "assump[tion]" that the "controlling interest" could have used its "complete power" to ensure that each member of the group "conduct[ed] its affairs [so] that its transactions and accounting records truly reflect[ed] [its] taxable income." *First Sec. Bank*, 405 U.S. at 404 (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)). *First Security Bank* itself notes that the regulation was "consistent" with its holding that the controlling interest must "have complete power to shift income among its subsidiaries," but that the regulation came from "a different context." *Id.* Nevertheless, the IRS draws the conclusion that the Supreme Court would have come out differently in the absence of the regulation.

The opinion all but says otherwise. Right from the beginning, the Supreme Court framed the issue around the statute: whether "pursuant to *§ 482* of the Internal Revenue Act[,] . . . the income of taxpayers within a controlled group should be reallocated to reflect the true taxable income of each." *Id.* at 395 (emphasis added). Then, in describing its "holding" at the end, it answered the question it posed at the beginning: "The Commissioner's exercise of his *§ 482* authority was . . . unwarranted in this case." *Id.* at 407 (emphasis added). In between there are scattered references to the now-repealed regulation, but only to provide further support for the idea that the *statute* imposed a dominion-or-control requirement. *Id.* at 404 (noting that its dominion-or-control test was "expressly recognize[d]" by and "consistent with" the regulation). Exactly what we conclude today.

C.

In a last-ditch effort to distinguish this case from *First Security Bank*, the IRS argues that 3M had "dominion or control" because its subsidiary could have paid dividends in lieu of royalties. For support, it points to the fact that 3M do Brasil paid $64.5 million in dividends in 2006. Nothing, including Brazilian law, prevented the company from paying nearly $23.7 million more to account for the extra income it received from the use of 3M's intellectual property.

To the extent the IRS is suggesting that 3M had a duty to "purposely evade" Brazilian law, we "firmly" disagree. *Procter & Gamble*, 961 F.2d at 1259 (rejecting the "suggestion that P&G should purposefully evade [foreign] law by making royalty payments under the guise of calling the payments something else"). As the Supreme Court put it, "'complete power' . . . hardly includes the power to force a subsidiary to violate the law." *First Sec. Bank*, 405 U.S. at 404–05.

A more charitable reading of the IRS's argument is that 3M had a choice: receive the royalties as dividends or have its Brazilian subsidiary stop using the intellectual property. It is a familiar argument, reminiscent of the one the IRS made in *First Security Bank*. There, the IRS argued that it "never forced" the banks to

violate federal law because they could have "offer[ed] credit life insurance to their borrowers at a lower rate" and refused the commissions. Brief for Petitioner at 31–32, *First Sec. Bank*, 405 U.S. 394 (No. 70-305). That argument, like the one here, may just reflect an expectation that taxpayers ought to structure their affairs to maximize, rather than minimize, the amount of taxes owed.[2]

Even aside from invoking a sense of déjà vu, there are a couple practical problems with the suggestion. For one thing, dividends and royalties are different, both in form and function. Declaring dividends, which take the form of nondeductible returns on contributed capital, is discretionary. *See Aspro, Inc. v. Comm'r*, 32 F.4th 673, 678 (8th Cir. 2022); James D. Cox & Thomas Lee Hazen, 3 *Treatise on the Law of Corporations* § 20:2 (4th ed. 2024). Paying royalties, which are fixed by contract and deductible as business expenses, is not. *See* 26 U.S.C. § 162(a); 10 *Mertens Law of Federal Income Taxation* § 40:21 (Dan Sheaffer ed., 2024). The power to do one has no bearing on the other.

The IRS's argument is also breathtaking in its potential reach. Why stop at dividends? If a parent company *could* force a foreign subsidiary to liquidate to get the royalties it thinks should have been paid, what would prevent the IRS from reallocating under § 482 in those circumstances too? Treating income sources as interchangeable, like the IRS proposes, would mean that "the tax" would no longer "fall on the party that actually receives the [income] rather than on the party that cannot." *First Sec. Bank*, 405 U.S. at 405. In short, IRS reallocation would start "distort[ing] their true . . . incomes," not "truly reflect" them. *Id.* at 404, 407.

---

[2]It makes no difference that recharacterizing income is, by its nature, hypothetical. Although it does not require changing anything in the real world, a determination that following Brazilian law distorted 3M's income sends a clear message about what the company should have done. Not that doing things the IRS's way would have helped. 3M's Brazilian subsidiary paid $64.5 million in dividends *already*. If royalties and dividends are truly interchangeable in these circumstances, as the IRS suggests, then why not just reallocate *those* dividends under § 482 and move on?

## IV.

We accordingly reverse and remand for the Tax Court to redetermine the taxes owed by 3M for 2006.

_____